# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

### January 2019 Term

_____

No. 17-0126

_____

FILED

June 10, 2019

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**ROBERT L. ANDREWS, ET AL.,**
**Plaintiffs Below, Petitioners**

**V.**

**ANTERO RESOURCES CORPORATION**
**AND HALL DRILLING, LLC,**
**Defendants Below, Respondents**

_____

Appeal from the Mass Litigation Panel
Circuit Court of Ohio County
The Honorable Alan D. Moats, Lead Presiding Judge
*In Re:  Marcellus Shale Litigation*
Civil Action No. 14-C-3000

AFFIRMED

_____

Submitted: January 15, 2019
Filed: June 10, 2019

Anthony J. Majestro
Powell & Majestro, PLLC
James C. Peterson
Aaron L. Harrah
Hill, Peterson, Carper, Bee &
    Deitzler, PLLC
Charleston, West Virginia
Attorneys for the Petitioners

W. Henry Lawrence
Richard M. Yurko
Lauren K. Turner
Amber M. Moore
Jason W. Turner
Steptoe & Johnson PLLC
Bridgeport, West Virginia
Ancil G. Ramey
Steptoe & Johnson PLLC
Huntington, West Virginia
Donald C. Sinclair II

**Steptoe & Johnson PLLC**
**Wheeling, West Virginia**
**Attorneys for Respondent,**
**Antero Resources Corporation**

**Christopher L. Hamb**
**Craig S. Beeson**
**Robinson & McElwee, PLLC**
**Charleston, West Virginia**
**Stephen F. Gandee**
**Clarksburg, West Virginia**
**Attorneys for Respondent,**
**Hall Drilling, LLC**

**William M. Herlihy**
**Spilman Thomas & Battle, PLLC**
**Charleston, West Virginia**
**Matthew P. Heiskell**
**Spilman Thomas & Battle, PLLC**
**Morgantown, West Virginia**
**Attorneys for Amici Curiae,**
**West Virginia Oil & Natural Gas**
**Ass'n, and The Independent Oil &**
**Gas Ass'n of West Virginia, Inc.**

**Louis S. Southworth**
**Albert F. Sebok**
**Candice M. Harlow**
**Jackson Kelly PLLC**
**Charleston, West Virginia**
**Attorneys for Amici Curiae,**
**West Virginia Chamber of Commerce,**
**_et al._**

**JUSTICE JENKINS delivered the Opinion of the Court.**

**JUSTICE ARMSTEAD AND JUSTICE HUTCHISON, deeming themselves disqualified, did not participate in the decision of this case.**

**JUDGE GREGORY L. HOWARD, JR., and JUDGE RUSSELL M. CLAWGES, JR., sitting by temporary assignment.**

**CHIEF JUSTICE WALKER** concurs and reserves the right to file a concurring opinion.

**JUSTICE WORKMAN AND JUDGE CLAWGES** dissent and reserve the right to file dissenting opinions.

**SYLLABUS BY THE COURT**

1.      "In order for a claim for an implied easement for surface rights in connection with mining activities to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner."  Syllabus point 3, *Buffalo Mining Co. v. Martin*, 165 W. Va. 10, 267 S.E.2d 721 (1980).

2.      "If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure."  Syllabus point 3, *Williams v. Precision Coil, Inc*., 194 W. Va. 52, 459 S.E.2d 329 (1995).

**Jenkins, Justice:**

This appeal from the Mass Litigation Panel ("MLP") pertains to ongoing Marcellus shale litigation and arises from claims asserted by surface owners of several tracts of land. These surface owners contend that their use and enjoyment of their land is being improperly and substantially burdened by horizontal wells being used to develop the Marcellus shale underlying their properties,[1] even though the wells are not physically located on any of their properties. The MLP resolved the claims based upon property rights arising from relevant severance deeds, and granted summary judgment in favor of the defendants below, who are the leaseholder of the gas and oil estates and the company who is conducting the drilling. In granting summary judgment, the MLP concluded that the effects on the surface owners resulting from the horizontal drilling were within the implied rights to use the surface granted by virtue of the severance deeds, and did not impose a substantial burden on the surface owners. Thus, to overcome summary judgment on this issue, the surface owners were required to establish the existence of a genuine issue of material fact as to whether the effects on their surface estates were reasonably necessary to develop the mineral estate, or whether such effects substantially burdened the owners of the relevant surface estates. Having considered the briefs submitted by the parties and by

---

[1] Although the surface owners originally asserted a nuisance claim, the MLP resolved the claim based upon property rights and declined to "address the issues to which common law private nuisance principles would be applied." Accordingly, no issues pertaining to private nuisance principles have been presented to this Court on appeal. *See infra* note 15 and accompanying text.

1

Amici Curiae,[2] the appellate record, the oral arguments presented, and the relevant law, we find no genuine issues of material fact were established in this particular case, and we, therefore, affirm the order of the MLP.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Antero Resources Corporation and Antero Resources Bluestone, LLC (collectively "Antero"), Respondents herein, are engaged in the development of the Marcellus shale in West Virginia and own numerous horizontal Marcellus shale wells located in Doddridge, Harrison, and Ritchie Counties.[3]  Antero contracted with Hall Drilling, LLC ("Hall"), also a Respondent, for the construction of well pads and roads, well drilling, and the operation of wells and gathering lines.  Relevant to the instant litigation, Antero has leasehold rights to develop oil and gas underlying various properties in Harrison

---

[2] The following Amici Curiae filed briefs in support of Antero and Hall: West Virginia Oil & Natural Gas Association; The Independent Oil & Gas Association of West Virginia, Inc.; West Virginia Chamber of Commerce; West Virginia Business and Industry Council; West Virginia Coal Association; Contractors Association of West Virginia; West Virginia Chapter of Associated Builders and Contractors, Inc.; West Virginia Manufacturers Association; and West Virginia Poultry Association.  We acknowledge their participation and express our appreciation for their contributions to our consideration of this important case.

[3] Antero is the successor in interest to Bluestone Energy Partners by merger and mesne conveyances.

County, including surface properties that are resided on and/or owned by the Petitioners herein[4] (collectively "Property Owners").

Antero's leasehold rights to develop the subject oil and gas located in Harrison County derive from severance deeds, executed in the early 1900s, that retained mineral rights underlying the properties. The properties belonging to Robert and Deborah Andrews,[5] Rodney Ashcraft, and Greg McWilliams are each subject to a severance deed executed in 1905 that reserves mineral rights including,

---

[4] The original petitioners, identified in the notice of appeal filed in this Court on February 10, 2017, were: Robert Andrews; Deborah Andrews; Rodney Ashcraft; Lindsey Feathers; Robert Golden; Daniel Kinney; Sharon Kinney; Charles A. Mazer; Douglas A. Mazer; Shawn A. Mazer; Susan J. Mazer; Gregg G. McWilliams; David Scott Nutt, Jr.; Robert Siders; and Charles T. Mazer.

After the instant appeal was filed, certain Petitioners filed a motion for voluntary dismissal of their appeal with prejudice, in which they sought a *partial* voluntary dismissal. The particular petitioners who filed the motion were: Lindsey Feathers; April Golden; Robert Golden; M. Golden; Daniel Kinney; Sharon Kinney; Douglas Mazer; Catherine Mazer; Shawn Mazer; Charles A. Mazer; the Estate of Charles T. Mazer; Susan Mazer; and David S. Nutt, Jr. Their motion was granted by order entered on June 19, 2017. Although Shawn Mazer was inadvertently omitted from this Court's order granting the partial voluntary dismissal, he was named on the motion and, therefore, was effectively dismissed from this appeal by the June 19, 2017 order. Accordingly, these former petitioners are no longer parties to this appeal.

The remaining petitioners, referred to herein as Property Owners, are: Robert L. Andrews, Deborah Andrews, Rodney Ashcraft, Greg G. McWilliams, and Robert Siders.

[5] Antero also is entitled to use the surface property of Robert and Deborah Andrews in accordance with a right-of-way agreement executed between Mr. and Mrs. Andrews and Bluestone Energy Partners, Antero's predecessor in interest. The right-of-way agreement expressly grants the rights

the right to drill, bore and operate for [oil and gas] at any time, also the right to use water from said land for the purpose of said drilling, boring and operating, and the right at any time to remove all necessary machinery used for the last named purposes, upon or off said land[.]

These properties also are the subject of a mineral lease that was executed in 1984, referred to by the parties as "the Moran Lease." The express rights granted to Antero in the Moran Lease include:

[E]xclusive possession and use for the purposes of exploring and operating for, producing, and marketing oil, gas, natural gasoline, casing-head gas, condensate, related hydrocarbons, and all products produced therewith or therefrom by methods now known or hereafter discovered, of injecting, storing, and withdrawing any kind of gas regardless of the source, of protecting stored gas, of injecting gas, air, water, and other fluids into sands and formations for the purpose of recovering and producing said minerals or for the purpose of disposing of waste fluids . . . [along with] all other rights and privileges necessary, incident to, and convenient for the economical operation of said land alone and conjointly with other lands for the production and transportation of said minerals[.]

---

(1) to lay, construct, repair, maintain, operate, remove and replace pipelines for the transportation of oil, gas, water and other liquid or gaseous substances, (2) to install, operate, maintain, remove and replace such drips, valves, fittings, meters and other equipment and appurtenances, including cathodic protection apparatus, and (3) to install, construct, maintain, operate, remove and replace pole and wires for the transmission of electricity, all as from time to time may be deemed by Grantee to be necessary or convenient in connection with the construction, maintenance, operation and protection of the foregoing . . . .

The severance deed pertaining to the remaining property subject to this appeal, the property owned by Robert Siders, was executed in 1903. It reserved rights to "all the oil and gas underlying the land herein conveyed together with the privilege of operating for and Marketing same." A 2001 mineral lease relevant to the Siders' property, referred to by the parties as "the Bland Lease," granted rights to Antero that included

> exploring and operating for, producing and marketing oil and gas, natural gasoline, casing head gas, condensate, related hydrocarbons, and all other related products, including the building of roads, laying pipelines and installing equipment thereon to take care of such products . . . [along with] the privilege of using sufficient water and gas from said premises to run all machinery necessary for drilling and operating thereon, and all rights of way necessary to develop the premises or remove equipment, and related items[.]

Relevant to this appeal, Antero operates six well pads to facilitate its horizontal drilling in the Cherry Camp area of Harrison County.[6] Horizontal drilling allows for the development of multiple wells from each surface well pad.[7] Reportedly, five of the six well pads at issue are located within a range of between .42 mile and 1 mile from Property Owners' properties. No well pads are located on any of Property Owners' land. In addition to the construction of the well pads, and the drilling and operation of the horizontal wells, the development of the Marcellus shale has also required the construction

---

[6] These six pads are identified as the "Hustead Pad," the "Hill Pad," the "Johnson Pad," the "Mary Post Pad," the "Matthey Pad," and the "O. Rice Pad."

[7] Property owners assert that these six pads result in twenty-four horizontal wells.

and/or operation of well roads, pipelines, and a compressor station.[8]  The hydraulic fracturing of the horizontal wells also necessitates water and sand, which are delivered by trucks.[9]

According to Property Owners, the activities of Antero and Hall in relation to their development of the Marcellus shale have caused Property Owners to lose the use and enjoyment of their properties due to the annoyance, inconvenience, and discomfort caused by excessive heavy equipment and truck traffic, diesel fumes and other emissions from the trucks, gas fumes and odors, vibrations, noise, lights, and dust.

---

[8] Antero denies ownership of the compressor station.

[9] The MLP described horizontal drilling thusly:

> With the development of the Marcellus Shale, horizontal drilling is used to recover natural gas.  Horizontal drilling requires a vertical well to be drilled, then the drill bit is turned and runs underground in a horizontal direction, extending anywhere from 2,000 to 10,000 feet away from the vertical well site. . . .  Several underground, horizontal wells are drilled away from the vertical well sites, much like a spider web design.  Because of the horizontal drilling, more wells can be located on one well pad.  Consequently, the well pads are usually larger, there are more hydro-fracturing zones, hydro-fracturing takes a longer period of time, and it takes more sand and water.

(Citations to the record omitted).

In 2013, Property Owners filed a complaint in the Circuit Court of Harrison County[10] alleging claims for "private temporary continuing abatable nuisance and negligence"[11] against Antero and Hall arising from their "natural gas exploration, extraction, transportation and associated activities in close proximity to [Property Owners'] properties."[12] By order entered on November 25, 2014, this Court transferred the claims to the MLP where they were designated as the "Harrison County Cherry Camp Trial Group."[13]

Following discovery, Antero and Hall each filed motions for summary judgment. Thereafter, Property Owners filed their response in opposition to the motions for summary judgment. In their response, Property Owners voluntarily withdrew their

---

[10] The action was assigned Case Number 13-C-434-3 in the Circuit Court of Harrison County.

[11] In the negligence count of their complaint, Property Owners included claims related to property damage when they asserted that Antero and Hall owed Property Owners numerous duties of care that included duties to "not cause damage to land," and to "prevent releases of hazardous, toxic and/or radioactive substances into the air, land, and water." However, as noted below, in their response to the motions for summary judgment filed by Antero and Hall, Property Owners voluntarily withdrew these claims. Thus, by doing so, Property Owners withdrew their claims of property damage.

[12] Unlike another horizontal drilling case that is also currently before this Court, *see EQT Production Co. v. Crowder et al*., No. 17-0968, (submitted March 12, 2019), Property Owners have asserted no claims of trespass in this litigation.

[13] Property Owners' claims were designated as part of the first trial group to be resolved by the MLP. Apparently, the claims of over 200 plaintiffs remain pending before the MLP.

negligence claim, and, during various hearings before the MLP, the Property Owners' counsel repeatedly stated that no property damage claims were being asserted;[14] this left only Property Owners' claim of nuisance to be resolved by summary judgment. However, the MLP, in its summary judgment order entered on October 11, 2016, declined to apply principles of nuisance law, and instead ruled on the summary judgment motions based upon Antero's contractual and property rights. The MLP explained that,

> [b]ecause the Court resolves summary judgment based upon Antero's contractual and property rights, it does not address the issues to which common law private nuisance principles would be applied. The Court, therefore, reaches no conclusion regarding whether Antero's actions or its employees' or contractors' actions would otherwise meet the legal definition of a nuisance.

(Quotations omitted).[15] The MLP also found that "Antero has leasehold rights to develop the oil and gas underlying the properties that are the subject of [Property Owners']

---

[14] *See* note 24 *infra*.

[15] Although Property Owners reference the term "nuisance" in two assignments of error that we decline to address, *see infra* notes 18 and 31, they have not raised as an assignment of error the MLP's failure to apply principles of nuisance law in reaching its summary judgment decision. As such, the application of nuisance law to this matter is not an issue that is properly before this Court on appeal. *See Siddy W. v. Charles W.*, No. 17-0416, 2018 WL 679507, at *3 (W. Va. Feb. 2, 2018) (memorandum decision) ("[R]ulings of lower courts that are not appealed become the law of the case and are conclusive in subsequent proceedings in that case."); *Noland v. Virginia Ins. Reciprocal*, 224 W. Va. 372, 378, 686 S.E.2d 23, 29 (2009) ("As a consequence of [a party's] failure to challenge [a circuit court's] finding in this appeal, any error in that ruling has been waived for purposes of this appeal. . . . More importantly, [w]e treat this ruling as the law of the case." (internal quotations and citations omitted)); *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but [which] are not supported with pertinent authority, are not considered on appeal."); *State Dep't of Health & Human Res. v. Robert Morris N.*, 195 W. Va. 759, 765,

8

complaint. Those development rights were retained by the oil and gas mineral owners in the severance deeds separating the surface estates from the mineral estates." Furthermore, the MLP concluded that "the noise, traffic, dust, lights and odors of which [Property Owners] complain are reasonable and necessarily incident to Antero's development of the underlying minerals." Therefore, the MLP granted summary judgment to Antero and Hall. Property Owners then filed a motion, pursuant to Rule 59(e) of the West Virginia Rules of Civil Procedure,[16] to alter or amend the judgment, which the MLP denied by order entered on January 11, 2017. This appeal followed.

## II.

## STANDARD OF REVIEW

We have previously held:

> The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed.

---

466 S.E.2d 827, 833 (1995) ("[A] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim[.]" (internal quotations and citations omitted)); Syl. pt. 6, *Addair v. Bryant*, 168 W. Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the brief on appeal may be deemed by this Court to be waived.").

[16] Property Owners' motion states that it is made pursuant to Rule 52(b) of the West Virginia Rules of Civil Procedure. However, Rule 52(b) addresses findings by the court. Civil Procedure Rule 59(e) actually governs motions to alter or amend a judgment.

Syl. pt. 1, *Wickland v. Am. Travellers Life Ins. Co.*, 204 W. Va. 430, 513 S.E.2d 657 (1998). Because the judgment underlying the MLP's Rule 59(e) ruling was the MLP's award of summary judgment, this Court's review is *de novo*. *See* Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*."). Accordingly, we proceed with our plenary review of this appeal.

## III.

## DISCUSSION

In granting summary judgment in favor of Antero and Hall, the MLP found that "Antero has leasehold rights to develop the oil and gas underlying the properties that are the subject of Plaintiffs' complaint. Those development rights were retained by the oil and gas mineral owners in the severance deeds separating the surface estates from the mineral estates." In view of Antero's leasehold rights and the original severance deeds, the MLP concluded that,

> [b]ased on its review of the record, the Court concludes there are no disputed issues of material fact and Defendants Antero and Hall are entitled to summary judgment as a matter of law. Antero, as the owner of the mineral estate, and its contractors have the right to use the Plaintiffs' surface estates for the production of its mineral rights. The Court further concludes that Antero and its contractors have the legal right to develop the mineral estate. The Court finds that the activities complained of were reasonably necessary to the production of the mineral estate and did not exceed the fairly necessary use thereof or invade the rights of the surface owner[.]

10

Property Owners contend that the MLP applied the wrong legal standard and ignored established rights belonging to surface owners under West Virginia law. Specifically, they contend that a mineral owner does not have the right to extract natural gas using methods that were uncontemplated when the operative severance deeds were executed, where those uncontemplated methods are not necessary to the extraction of the minerals and substantially burden the surface. According to Property Owners, the MLP impliedly and mistakenly relied on *Quintain Development, LLC v. Columbia Natural Resources, Inc.*, 210 W. Va. 128, 556 S.E.2d 95 (2001),[17] to conclude that the severance deeds constituted an easement and Antero's actions could not constitute a nuisance because their actions did not exceed the scope of the easement.[18]

Antero and Hall respond that the MLP applied the correct legal standards as to the rights of mineral owners vis-à-vis surface owners under West Virginia law, and

---

[17] We disagree with Property Owners' characterization of the MLP order as it relates to this Court's decision in *Quintain Development, LLC v. Columbia Natural Resources, Inc.*, 210 W. Va. 128, 556 S.E.2d 95 (2001). The MLP did refer to *Quintain*, but it did so primarily in connection with its findings that Antero and Hall, in conducting their oil and gas extraction activities, were acting within the scope of various agreements (e.g., subsurface-use and right-of-way agreements) executed with several property owners who were plaintiffs below. Most of the property owners who were subject to such agreements have withdrawn from this appeal.

[18] In addition, Property Owners argue that the owner of mineral rights underlying a particular property does not have the right to create a nuisance on the surface of that tract to develop minerals underlying another property. However, this issue was not addressed by the MLP and therefore is not proper for review. "This Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syl. pt. 5, *State ex rel. State Farm Mut. Auto. Ins. v. Bedell*, 228 W. Va. 252, 719 S.E.2d 722 (2011) (quotations and citations omitted).

11

correctly concluded that Antero holds an implied easement to use Property Owners' surface estates to the extent reasonable and necessary to develop its mineral leasehold.

Both of the severance deeds at issue granted to the mineral owner the right to produce oil and gas. The 1905 deed granted the mineral owner "the right to drill, bore and operate for [oil and gas]," while the 1903 deed retained for the mineral estate "all the oil and gas underlying the land herein conveyed *together with the privilege of operating for and marketing same.*" (Emphasis added). These express provisions clearly demonstrate a basic intention by the parties to the deeds that oil and gas would be extracted from the mineral estate. On this point there is no dispute.[19] In general, where a deed severs the mineral and surface estates and plainly allows for the extraction of the mineral estate, certain uses of the surface by the mineral owner are necessarily implied. As early as 1909, this Court held that "[t]he owner of the surface cannot obstruct the mineral owner from a use of the surface [that is] *fairly useful and necessary.*" Syl. pt. 1, in part, *Porter v. Mack Mfg. Co.*, 65 W. Va. 636, 64 S.E. 853 (1909) (emphasis added). In reaching this holding, the *Porter* Court reasoned that, even

> [i]f the deed [in question] had not reserved the right to mine and remove the minerals, *there would have been an implied right to use the surface in such manner and with such means as would be fairly necessary for the enjoyment of their estates in the minerals*. Without this right, what account would be the minerals which they reserved?

---

[19] For example, Property Owners specifically reference "the conventionally drilled wells common in Harrison County [contemplated] when [their] predecessors executed the relevant deeds."

12

*Id.* at 638, 64 S.E. at 854 (emphasis added). *See also Phillips v. Fox*, 193 W. Va. 657, 662, 458 S.E.2d 327, 332 (1995) ("It is well-settled that ownership of a mineral estate includes the right to enter upon and use the superjacent surface by such manner and means as is fairly reasonable and necessary to reach and remove the minerals."); Syl. pt. 1, *Squires v. Lafferty*, 95 W. Va. 307, 121 S.E. 90 (1924) ("The owner of the mineral underlying land possesses, as incident to this ownership, the right to use the surface in such manner and with such means as would be fairly necessary for the enjoyment of the mineral estate."). *See generally* 1A Rev. Nancy Saint-Paul, *Summers Oil & Gas* § 8:4 at 256 (3d ed. 2015) ("If in the grant or reservation of a separate interest in oil and gas the grantor does not expressly grant or retain the rights necessary for the production and operation of the land for oil and gas purposes, these rights, such as easement and water rights, *are held to be created by implication*." (emphasis added) (footnote omitted)). Thus, insofar as vertical wells would have been the normal method of extracting oil and gas contemplated by the parties at the time the relevant severance deeds were executed, it clearly would be a fairly necessary method for Antero to enjoy the mineral estate it has leased. In other words, Antero and Hall would certainly be within their rights to enter Property Owners' land and drill vertical wells.

However, the instant matter takes the query farther. While the foregoing cases make clear that a mineral owner necessarily has the implied right to "use the surface in such manner and with such means as would be fairly necessary for the enjoyment of their estates in the minerals," *Porter*, 65 W. Va. at 638, 64 S.E. at 854, they do not address

13

whether changes in mining methods driven by technological advancements that, according to Property Owners, place a greater burden on their surface estates even in the absence of physical wells being drilled thereupon, would be "fairly necessary for the enjoyment of" the mineral estate. *Id.*[20]

Property Owners urge that this dispute is resolved by a line of cases wherein this Court rejected certain uses of surface estates utilizing advances in technology finding, *inter alia*, that such methods were not within the contemplation of the parties at the time the severance deeds were executed. However, Property Owners misunderstand the significance of these cases. Notably, in this line of cases, the Court considered various deeds that did not expressly grant the mineral owner a right to destroy the surface, and rejected methods of removing minerals that caused such destruction when they did not exist at the time of the execution of the deed and could not possibly have been within the contemplation of the parties to the severance deed. [21]

---

[20] To the extent that neither deed at issue in this matter addresses whether new technology may be used to extract oil and gas, or describes specific burdens that may be placed upon the surface, the deeds are ambiguous. "As a general principle, ambiguities in a deed are to be clarified by resort to the intention of the parties ascertained from the deed itself, the circumstances surrounding its execution, as well as the subject matter and the parties' situation at that time." *Phillips v. Fox*, 193 W. Va. 657, 662, 458 S.E.2d 327, 332 (1995) (citing 23 Am. Jur. 2d *Deeds* § 221 (1983)). *See also Kell v. Appalachian Power Co.*, 170 W. Va. 14, 19, 289 S.E.2d 450, 456 (1982) ("In any construction of the language of a deed the intent of the parties is controlling." (footnote omitted)).

[21] Although these cases did involve technology that did not exist at the time the relevant severance deeds were executed, that fact, standing alone, was not dispositive. To the contrary, under West Virginia law, the use of technological advancements not expressly contemplated in a severance deed have nevertheless been implied. In *Bassell v.*

14

The Court addressed this concept in *West Virginia-Pittsburgh Coal Co. v. Strong*, 129 W. Va. 832, 42 S.E.2d 46 (1947). In *Strong*, the mineral owner sought to strip mine an eight-acre area of the surface estate. The mineral estate had been severed in a 1904 deed that also granted

> "the right to enter upon and under said land with
> employees, animals and machinery at convenient
> point and points, and to mine, dig, excavate and

---

*West Virginia Central Gas Co.*, 86 W. Va. 198, 103 S.E. 116 (1920), a lessor of an oil and gas lease sought to prevent the lessee from using compressors and pumps in the operation of gas wells. The lessor sought to prevent the use of compressors and pumps because, among other things, their use shortened the life of the wells drilled on the property and also lessened the number of wells needed to develop the gas, which, in turn, reduced the duration for which the lessor would receive annual rent for each well and reduced the number of wells for which such rent would be paid. Despite the fact that the lessor had no knowledge of the use of compressors and pumps in the development of gas and did not contemplate their use at the time the lease was executed, the Court nevertheless found in favor of the lessee based upon the principle that "[p]arties to contracts are held, in the absence of agreements to the contrary, to have contemplated modifications of their relations under their contracts, by the development of improvements and new methods in the progress of science and invention." *Id.* at 202, 103 S.E. at 117. *See also Armstrong v. Maryland Coal Co.*, 67 W. Va. 589, 608, 69 S.E. 195, 203 (1910) ("[C]ounsel for both parties rely upon and quote from Barringer and Adams on Mines and Mining, pages 576, 577, as follows: 'The right to work the mine involves the right to penetrate the surface of the soil for the minerals, to remove them in the manner most advantageous to the mine owner, and to use such means and process in mining and removing them as may be necessary in the light of modern improvements in the arts and sciences. *The owner is not limited to such appliances as existed at the time of the grant; he may freely employ the means of invention*; he may erect all adequate modern machinery for mining and draining.' . . . This we believe to be the law." (emphasis added)).

Other courts have reached the same conclusion. *See Ball v. Island Creek Coal Co.*, 722 F. Supp. 1370, 1373-74 (W.D. Va. 1989) ("In 1908, as today, the parties knew that 'knowledge [would] increase,' *see* Daniel 12:4, and that better mining techniques would become available. An owner of mineral rights should be allowed to take advantage of modern technology subject to the terms of the deed."); *Phipps v. Leftwich*, 216 Va. 706, 713, 222 S.E.2d 536, 541 (1976) (disallowing strip mining under relevant severance deed, but observing that the mineral owner "may, of course, take advantage of developments in the operation of underground mines which modern technology may make available").

remove all said coal, and to remove and convey from, upon, under and through, said land all said coal and the coal from other land and lands and to make and maintain on said land all necessary and convenient structures, roads, ways, and tramways, railroads, switches, excavations, air-shafts, drains and openings, for such mining, removal and conveying of all coal aforesaid, with the exclusive use of all such rights of way and privileges aforesaid, including right to deposit mine refuse on said land and waiving all claims for injury or damage done by such mining and removal of coal aforesaid and use of such privileges.

"All of the surface of the said land occupied or used by the said parties of the second part, or their assigns, above the level of the Pittsburg #8 vein of coal, for their operations herein shall be paid for before the same shall be so used, or occupied, at the rate of One Hundred Dollars per acre, and said party of the first part, his heirs or assigns shall execute and deliver a deed therefor, in fee simple, free from liens and incumbrances [sic], when said surface shall be taken and paid for."

*Id.* at 833-34, 42 S.E.2d at 48 (quoting deed). In concluding that the parties to the 1904 deed did not grant the right to remove the coal by the process of strip mining, the Court based its decision in significant part on evidence that the surface owner did not express any intent that the surface be destroyed.

This Court further developed this area of the law by creating a distinction between injuries or necessary or convenient burdens upon the surface as opposed to its destruction when considering what was within the contemplation of the parties at the time

16

they executed a severance deed. In *Oresta v. Romano Bros.*, 137 W. Va. 633, 73 S.E.2d

622 (1952), the Court pointed out that

> there is a pronounced practical distinction between an injury
> to, or the imposition of a necessary or convenient burden upon,
> the surface of land containing coal in or underneath the surface,
> each of which may be caused by the mining and the removal
> of such coal through and by means of excavations, tunnels, and
> passageways beneath the surface, or through and by means of
> shafts, borings, slopes, or entries which extend from an
> opening on the surface in and to the underlying coal and are
> located throughout their entire course and extent under the
> surface, *and the destruction, the removal, or the relocation in
> the mining and the removal of coal, of the overlying surface
> which necessarily results in substantial measure from the use
> of the presently recognized strip mining method.* See
> discussion of different types of coal mining rights in *Tokas v.
> J. J. Arnold Company*, 122 W. Va. 613, 11 S.E.2d 759
> [(1940)]. In the first mentioned situation, the surface, even
> when broken or caused to subside, is damaged, rather than
> destroyed; but in the second the surface affected is completely
> disturbed and is either destroyed or moved to a place other than
> that of its original location. *In view of this real and substantial
> distinction between an injury to, or a burden upon, the surface,
> in substantially its original location, and the removal of the
> surface from that location, it is manifest that mining rights
> which at the time of their creation are intended to limit,
> regulate and govern operations and methods which are carried
> out or engaged in chiefly in the coal and beneath the surface,
> do not apply to, cover, or permit the removal or the relocation
> of the overlying surface in the mining and the removal of the
> coal beneath it.*

*Oresta*, 137 W. Va. at 645-46, 73 S.E.2d at 629-30 (emphasis added).


Similarly, in *Brown v. Crozer Coal & Land Co.*, 144 W. Va. 296, 107 S.E.2d

777 (1959), this Court found that the parties to the deeds in question did not agree to the

removal of coal by the auger method of mining,[22] which they found to be similar to strip mining and caused significant damage to the surface. The *Brown* Court described the significant damage to the surface caused by the auger mining, which

> split the plaintiffs' land in two sections, the spoilage being over a mile in length and up to 400 feet wide in places, . . . the timber on the land in connection with the mining of the coal [was] destroyed or diminished in value. The right of ingress and egress and the building of roads certainly was not anticipated at the time the deeds in question were executed to any such extent as used in auger mining as indicated on the land of the plaintiffs in this case. The defendant's superintendent, having supervision of this work, testified that the operation in the building of the roadway was not done in a skillful and workmanlike manner. The roadway was not provided with drains and the operation was merely made as stated above, to obtain the coal from the land. *There is no question that a considerable amount of surface was removed in obtaining the coal* . . . .

*Id.* at 309-10, 107 S.E.2d at 786 (emphasis added). *Cf. Kell v. Appalachian Power Co*., 170 W. Va. 14, 19, 289 S.E.2d 450, 456 (1982) (enjoining power company from using method of aerial broadcast spraying toxic herbicides to maintain right-of-way for its power

---

[22] *Brown v. Crozer Coal & Land Co*., 144 W. Va. 296, 107 S.E.2d 777 (1959), involved three deeds:

> [O]ne made in 1904 granting mineral rights in "all minerals" with "all rights-of-way, of ingress and egress over, across and through [said land] for the purpose of removing the minerals &c. therefrom"; one made in 1905 granting "all the coal and other minerals and mineral substances . . . together with the right to mine and remove said minerals in the most approved method"; and one made in 1907 reserving "all minerals . . . together with all necessary and useful rights for the proper mining, pumping, transporting of said minerals[.]"

Syl. pt. 8, in part, *id*.

transmission line and finding that "[i]t was clearly not the intention of the parties to allow the power company *to destroy all living vegetation within the area sprayed or adjoining areas where these deadly herbicides could drift*. Such action is not necessary to the protection of the power company's equipment. Aerial broadcast spraying *destroys the vegetation indiscriminately*, whether it poses a danger or hindrance to the power company's equipment or not. Nor can it be said that the parties intended, by the grant in the 1939 indenture *to repeatedly expose themselves to hazardous activities and chemical agents*." (emphasis added)).

The distinguishing factor between the forgoing cases and the case *sub judice* lies in the incompatibility of the use of the surface by the mineral owner with the use of the surface by the surface owner. In each of the cases discussed above, the use of the surface by the mineral owner caused such significant damage to the surface that it amounted to the destruction thereof and was utterly incompatible with any use the surface owner may have engaged in or anticipated as a future surface use. *See Quintain Dev.*, 210 W. Va. at 133, 556 S.E.2d at 100 (identifying many of the same cases discussed above and commenting that, if the mineral owner's right to interfere with the surface owner's enjoyment of his or her land was "expanded to include surface mining, when that type of mining did not exist in the relevant area at the time of the execution of the deed, then the interference with the owner's ability to enjoy his or her land would have been materially different from that which the owner contemplated at the time of granting the right. Moreover, *any use such a surface owner may have planned for the surface of the land, which would have been*

19

*compatible with forms of mining coal that were known at the time of the execution of the deed, could very well have been rendered impossible* if the general terms of such a deed were interpreted to include surface mining." (emphasis added)); *Buffalo Mining*, 165 W. Va. at 14-15, 267 S.E.2d at 724 (acknowledging that cases finding no authority to strip and/or auger mine "were each based on two grounds. First, at the time of the original severance deed, neither strip nor auger mining was known and therefore could not have been within the contemplation of the parties. Second, *and of even more importance, was the fact that these mining methods virtually destroyed the surface for its normal use*[.]" (emphasis added)).[23]

---

[23] Obviously, in the cases discussed above there was no express grant of the right to strip mine in the operable severance deeds. As this Court has observed, however,

> [a] severance deed may . . . *expressly* permit surface mining as a method of extracting underlying minerals. In *Roberts v. Powell*, 157 W. Va. 199, 203, 207 S.E.2d 123, 126 [(1973)], the grantors reserved "'all coal *and* mineral underlying the above surface lands and sufficient rights of way to properly mine all of the said coal. The [grantee] shall be paid a reasonable damage for all surface openings and water sinkings that may occur by any mining operations[;]'" and further that "'all developing of the unconveyed mineral rights . . . shall never be construed to permit mining of the surface . . . by such means . . . known as "stripping" without compensation for the surface destroyed[.]'" (emphasis provided). *See Tokas v. J.J. Arnold Co.*, 122 W. Va. 613, 11 S.E.2d 759 (1940) (landowner cannot prevent surface mining when stripping rights have been expressly and unequivocally excepted from a grant of the surface estate absent "statutory inhibition, fraud or other vitiating circumstances." Syl. pt. 1, in part, *Id*.).

*Phillips*, 193 W. Va. at 664, 458 S.E.2d at 334.

20

In the case *sub judice*, on the other hand, there has been no claim of destruction of the surface estates, or even of any damage thereto. [24] In analyzing this issue,

---

[24] During hearings before the MLP, counsel for Property Owners stated more than once that no claims for property damage were being asserted. For example, the following exchange was had during a hearing in June 2015:

> CHAIRMAN JUDGE MOATS: But you're not talking about soil contamination[?]
>
> MR. MAJESTRO: We have clients who are worried about what's in their soil, so they're getting things tested and figuring those issues out.
>
> CHAIRMAN JUDGE MOATS: But have you made claims for soil contamination?
>
> MR. MAJESTRO: Not apart from just "This is a nuisance." *They're not property damage- -*
>
> JUDGE HUMMEL: Is that based on the fracking or what?
>
> MR. MAJESTRO: The fracking chemicals. I mean, it's a - - it is not a - - *we don't have a claim for property damage in these Complaints. They're nuisance claims*.

(Emphasis added). At a subsequent hearing in February 2016, Property Owners' counsel again stated that no claims for property damage or personal injury were being asserted:

> JUDGE MOATS: Now, it's my understanding -- or our understanding from all of your briefs that nobody's claiming any property damage.
> Is that correct, Mr. Majestro?
>
> MR. MAJESTRO: Yes, Your Honor.
>
> JUDGE MOATS: Nobody's claiming any personal injury?
>
> MR. MAJESTRO: Yes, Your Honor.

21

the MLP described the use of traditional vertical wells and thereby indicated the type of

burden to the surface that would have been contemplated by the parties at the time the

relevant deeds were executed:

> [t]raditional oil and gas wells in West Virginia are vertical wells, with smaller drill rigs and fairly small well pads, located on one-third to one-half of an acre of land. A well road is built, the well pad is built, and the drill rig drills the vertical well several thousands of feet deep. After the well is drilled, a steel casing is put in the well, the drill rig leaves, and a hydro-fracturing company comes in to fracture the well. After the well is fractured and flow-back occurs, production starts and pipelines carry the natural gas from the well head to a larger transmission line for transport to market.

The MLP found that the burden on the surface estates created by horizontal drilling that is

taking place .42 mile to 1 mile away from the subject property is not materially different

from the burden that would be endured from the placement of traditional vertical wells

directly on Property Owners' land, along with the construction of an associated well pad,

lease road, and pipeline for each well,[25] which is within Antero's rights. In fact, Antero

and Hall submitted excerpts from the report of their expert, Robert W. Chase, who

indicated that horizontal drilling is the best means of developing the Marcellus shale

formation because it requires fewer wells than vertical drilling and thereby generally

minimizes the disruption to nearby surface estates.[26]

---

[25] The report of Antero's expert explained that "vertical well drilling requires a location, lease road, and pipeline for every single vertical well."

[26] Other commentators have likewise concluded that horizontal drilling is more efficient and minimizes the disturbance to area surface estates. *See, e.g.,* Jason A. Proctor, *The Legality of Drilling Sideways: Horizontal Drilling and Its Future in West Virginia*, 115 W. Va. L. Rev. 491, 497-98 (2012) ("A single horizontal well, when located

Because of the burden that could be placed on Property Owners' physical land by vertical drilling thereupon, and the associated limitations on Property Owners' use and enjoyment of the surface by virtue of such drilling, it was incumbent upon Property Owners to present evidence to establish how the burdens resulting from the off-site horizontal drilling of which they now complain (i.e., dust, traffic, lights, noise, and fumes) has prohibited them from using their land in any way that would be compatible with the physical presence of vertical wells directly on their land. They have failed to do so. Indeed,

in a permeable reservoir such as the Marcellus Shale, can gather significantly more underground gas than a single vertical well in the same location. These higher production rates can equate to a higher return on investment for horizontal well projects than for vertical well projects when used in the proper manner. . . . Additionally, numerous horizontal wells can be drilled using the same well pad on the surface. *This practice can significantly reduce surface disturbance because several horizontal wells in the same location can produce as much or more gas than numerous vertical wells scattered across a wider area.*" (footnotes omitted) (emphasis added)); *Why Multiple Horizontal Wells from centralized well pads should be used for the Marcellus Shale*, West Virginia Surface Owners' Rights Organization, https://wvsoro.org/multiple-horizontal-wells-centralized-well-pads/ (last visited April 30, 2019) ("Not only is horizontal drilling of multiple Marcellus Shale gas wells from centralized well pads/sites better for surface owners, it is better for lots of other people and interests: •It is less risk to ground water if there are only 6 penetrations in one place from the 6 or 8 wells on the centralized pad instead of 24 all over the place. •It lessens the dangers of other environmental concerns because there is less forest fragmentation, less inevitable steam siltation from more access roads (and horizontal well access roads tend to be better constructed and maintained than vertical well access roads) etc. etc. •It is better for coal owners and coal companies and coal miners. This is because the horizontal well driller goes through the coal seams while the well bore is still being drilled vertically. So 6 or 8 well bores are drilled through one spot in the horizontal coal seam, rather than drilling 24 vertical bores drilled all through the coal seam. Since the well bores are drilled in one spot, there is less risk to the safety of miners of running into one as they mine through the coal seam. Because coal companies have to leave a circle of unmined coal around every gas well bore in order to protect miners, having 24 well bores spread out all through the coal seam would 'sterilize' large quantities of coal from being mined. •Investors in oil and gas drilling probably also are benefitted. Although the initial capital cost of a horizontal well is greater, they get out more gas faster and cheaper than vertical wells and so save production costs in the long run.").

23

Property Owners have failed to assert that they are being deprived of any uses that would be compatible with a vertical well located directly on their property. As the MLP expressly found, there is "no evidence in the record indicating Antero's methods are 'materially different' from the extraction methods contemplated at the time the minerals were severed or acquired, or are incompatible or destructive to the surface estate." Because of this, and because Property Owners have claimed no damage whatsoever to their surface estates, we find the foregoing cases simply are not instructive in the context presented by the instant litigation. Instead, we are guided by other cases that did not involve such extensive damage to the surface estate. These cases direct greater focus upon how to balance the competing rights to utilize the surface possessed by surface owners and mineral owners.

An early case in this line is *Squires v. Lafferty*, 95 W. Va. 307, 121 S.E. 90. In *Squires*, the surface owners had refused to allow the mineral owner to transport across the surface machinery, equipment, and men needed for its drilling operations. The *Squires* Court adopted a "fairly necessary" standard for a mineral owner's use of the surface when it held that "[t]he owner of the mineral underlying land possesses, *as incident to this ownership*, the right to use the surface in such manner and with such means *as would be fairly necessary for the enjoyment of the mineral estate*." Syl. pt. 1, *id.* (emphasis added). The Court explained that

> [t]his rule is based upon the principle that, when a thing is granted, all the means to obtain it and all the fruits and effects of it are also granted. *The use of the surface here involved is not only a reasonable burden to the surface owner, but is fairly necessary in the development and operation of the coal*.

24

*Id.* at 309-10, 121 S.E. at 91 (emphasis added).

The standard for balancing the rights of surface owners and mineral owners in relation to implied uses of the surface estate was further clarified in *Buffalo Mining Co. v. Martin*, 165 W. Va. 10, 267 S.E.2d 721 (1980). The severance deed in *Buffalo Mining* had expressly granted the mineral owner certain uses of the surface, including the right to erect telephone and telegraph lines. The question before the Court was whether the deed granted an implied surface easement for an electric line to be used to ventilate a coal mine. The Court explained that

> where implied as opposed to express rights are sought, the test of what is reasonable and necessary becomes more exacting, since the mineral owner is seeking a right that he claims not by virtue of any express language in the mineral severance deed, but by necessary implication as a correlative to those rights expressed in the deed. In order for such a claim to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner.

*Id.* at 18, 267 S.E.2d at 725-26. Accordingly, the Court held that

> [i]n order for a claim for an implied easement for surface rights in connection with mining activities to be successful, it must be demonstrated not only that the right is reasonably necessary for the extraction of the mineral, but also that the right can be exercised without any substantial burden to the surface owner.

Syl. pt. 3, *Buffalo Mining*, 165 W. Va. 10, 267 S.E.2d 721. Because the rights at issue in the case *sub judice* are implied, *Buffalo Mining* provides the proper test.

25

Applying the *Buffalo Mining* holding in the context of our review of whether summary judgment was proper in this case, we consider the existence of a genuine issue of material fact as to whether Antero's activities to develop its mineral estate were reasonably necessary, and whether they were carried out without substantial burden to Property Owners.

The first portion of the *Buffalo Mining* test is easily resolved. The MLP found that Property Owners did not offer evidence "to establish . . . what is reasonable and necessary to develop the underlying minerals, other than self-serving assertions that Defendants' activities . . . are excessive." Similarly, in this appeal, Property Owners have failed to develop an argument to show the existence of a genuine issue of material fact as to whether or not Antero's activities to develop its mineral estate are reasonably necessary. Thus, we need not address this portion of the *Buffalo Mining* test. *See State Dep't of Health & Human Res. v. Robert Morris N*., 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995) ("A skeletal 'argument', really nothing more than an assertion, does not preserve a claim . . . ." (citation omitted)). *See also Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 391-92 (4th Cir. 2013) (recognizing that a plaintiff bears the burden of demonstrating what is reasonably necessary for the extraction of the mineral estate insofar as "no West Virginia case has treated a mineral estate owner's claim to 'reasonably necessary' use of the surface to extract minerals as an affirmative defense."). Instead, Property Owners focus on the manner in which the drilling activities were carried out, which goes to the second *Buffalo Mining* factor. Thus, we proceed to analyze that factor: the burden to the surface owner.

26

The concept of what amounts to a substantial burden to a surface owner does not lend itself to a precise definition. Instead it requires an examination of uses of the surface that have either been reserved by a severance deed or otherwise implied from the circumstances presented, and further examination of how that use of the surface is impacted by the mineral owner. *See, e.g.,* W. Va. Code § 22-6B-1(a)(1) (LexisNexis 2014) ("Exploration for and development of oil and gas reserves in this state must coexist with the use, agricultural or otherwise, of the surface of certain land and that each constitutes a right equal to the other."). As evidenced by our discussion above of the various cases involving strip and auger mining, a use of the surface without express authority that causes its destruction is typically considered a substantial burden on the surface owner as such mining is incompatible with any use of the surface.[27] However, in cases involving a mineral owner's use of the surface that is compatible with the surface owner's use thereof, albeit inconvenient to the surface owner and even damaging to the surface estate, this Court, as well as federal courts interpreting West Virginia law, have generally found the use of the surface to be within the rights of the mineral owner. *See Thornsbury v. Cabot Oil & Gas Corp.*, 231 W. Va. 676, 682, 749 S.E.2d 569, 575 (2013) ("A reasonable use of a surface estate by a mineral owner generally includes the construction of a road to access a drilling site."); *Buffalo Mining*, 165 W. Va. 10, 267 S.E.2d 721 (allowing mineral owner

---

[27]*See* Syllabus, *Phillips*, 193 W. Va. 657, 458 S.E.2d 327 ("The grant of a right to surface mine may be express or implied. The right to surface mine will only be implied if it is demonstrated that, at the time the deed was executed, surface mining was a known and accepted common practice in the locality where the land is located; that it is reasonably necessary for the extraction of the mineral; and that it may be exercised without any substantial burden to the surface owner.").

to construct an electric line across surface); *Adkins v. United Fuel Gas Co.*, 134 W. Va. 719, 724, 61 S.E.2d 633, 636 (1950) (concluding "[t]here was nothing done which was unnecessary or unreasonable in the construction of the road to bring machinery in to drill the defendant's gas well. Likewise the laying of the pipe line over the surface of the land is not disclosed to have been unnecessary. The construction of the open ditch for draining sand, water and other refuse from the well during the drilling thereof seems to have been an effort on the part of defendant to prevent the spreading of such sand, water and refuse over the adjacent surface of plaintiff's land, and, therefore, was a minimization of damages."; and further concluding "we can see no violation of the rights of plaintiff, nor can we perceive that defendant exceeded its rights in drilling a gas well on the 50-acre tract of land owned by plaintiff"); *Squires*, 95 W. Va. 307, 121 S.E. 90 (permitting the drilling of test holes and the transportation of equipment and workers across surface estate); Syl. pt. 2, *Coffindaffer v. Hope Nat. Gas Co.*, 74 W. Va. 107, 81 S.E. 966 (1914) ("A person, having the right to go upon another's land, 'to bore and develop said land for oil and gas with the necessary usual and convenient rights' therefor, has the right to build a road over the land when necessary to haul machinery and material to the place selected for drilling a well."); Syl. pt. 2, in part, *Porter v. Mack Mfg. Co.*, 65 W. Va. 636, 64 S.E. 853 ("The owner of the surface cannot obstruct the mineral owner from a use of the surface for a tramway or other means of transportation fairly useful and necessary."). *See also Whiteman*, 729 F.3d at 394 (applying West Virginia law and finding that "creating drill waste pits was reasonably necessary for recovery of natural gas and did not impose a substantial burden on the . . . surface property," where ten acres of 101 acre tract was

28

rendered unusable); *Teel v. Chesapeake Appalachia, LLC*, 906 F. Supp. 2d 519 (N.D.W. Va. 2012) (concluding, based on West Virginia law, that waste pit constructed on surface estate was reasonable), *aff'd*, 542 F. App'x 255 (4th Cir. 2013).

Property Owners contend that the activities of Antero and Hall constitute a substantial burden on their right to use and enjoy their surface estates. In making this argument, Property Owners complain of a variety of annoyances, inconveniences, and discomforts arising from the off-site drilling activities of Antero and Hall, which were described in great detail by Property Owners, themselves. While Property Owners have thoroughly described the various burdens they have experienced,[28] their complaints simply

[28] The record contains deposition testimony by certain Property Owners wherein they describe the effects they have experienced from the oil and gas development activities of Antero and Hall. According to the Property Owners who remain parties to this appeal, they experienced the following types of disruptions:

Deborah Andrews complained of excessive traffic traveling at excessive speeds in general and past her home, which is right on the road. At times the traffic delayed her travel. She described one incident where she pulled off the road as far as she could due to an oncoming truck, and the truck hit the side view mirror and knocked it off of her car. (The responsible company, which she did not identify in her deposition, repaired the vehicle). In addition, Ms. Andrews stated that the noise, the sound of jake brakes, the fumes, and the lights from the traffic were disruptive and also interrupted her sleep. She said the traffic is not continuous, but when it is ongoing it is "very annoying" and affected her concentration. She further complained of dust resulting from the traffic that settled on her house, field, and car. Ms. Andrews additionally testified, however, that when she notified Antero about damage to her fence, the fence was repaired each time. Property Owners do not direct this Court to a separate account of the complaints of Robert Andrews in the record.

Rodney Ashcraft described excessive lights from trucks passing by his house on a public road at night that disturbed his sleep "some" by shining into his bedroom window, which has no blinds. These lights include truck headlights and flashing orange

29

lights mounted on the trucks. He stated that he could not say if the trucks are operating more lights than necessary to negotiate the road safely. Mr. Ashcraft also complained of excessive dust resulting from truck traffic on the road when it is dry, and of diesel exhaust emanating from the trucks. Mr. Ashcraft additionally testified, however, that he has maintained a garden for his personal use for the last forty years and he has had no trouble gardening as a result of the activities of Antero and Hall.

Greg McWilliams talked about noise coming from the compressor station (Antero denies ownership of the compressor station) that caused him to spend less time outside in the summer, but he stated that the noise has been intermittent since drilling stopped and he has been able to enjoy more and more time outside. He also complained of trucks speeding on the road and excessive dust hanging in the air caused by the truck traffic on the gravel road that passes his home. He described the dust as bothersome when the weather was dry. Mr. McWilliams related that there was about a two-week period where construction was ongoing in a hollow across from his home and large stadium lights were set up and were run twenty-four hours per day. Large trucks were traveling in and out of the construction area at all hours during that two-week period as well. He also experienced lights during the construction of a nearby well pad that disrupted his sleep. Mr. McWilliams explained that "everything ebbed and flowed. But sometimes . . . it seemed like things were going on for weeks and weeks at a time with nonstop traffic." He characterized the noise as being an issue, particularly the sounds created by jake brakes and other noises from the heavy trucks, and explained that during the drilling he was unable to open his windows due to the noise it created, but that since the drilling had stopped, he was keeping his windows open as much as possible. He also shared an incident where a diesel truck carrying gravel overturned in front of his driveway and a diesel odor lingered for a number of weeks thereafter.

Finally, Robert Siders related that his house is close to the road and the heavy equipment on the road caused a humming sound and he could feel vibrating (although he knew of no damage to his home from the vibration). He stated that the truck traffic was heavy and noisy and kept him up, and lights from the trucks and from a nearby well pad disturbed him "all hours of the night." He described dirt and mud that covered his car and caused him to have to frequently wash it. He also complained of an odor that lingered for a couple of days, but stated that, at the time of his deposition, he had not experienced the odor for about a year. He also said there were excessive diesel fumes and odors from the numerous trucks on the road. He mentioned continuously flashing lights on the "rig," but said that the rig was "down now." He also complained of a sound like a "roaring piece of equipment running," but explained that it was "not all the time." He also could see a flame and hear a hissing sound for long periods of time when there was "flaring" at the well, but the flaring also had ceased.

30

do not rise to the level of a substantial burden when compared to the cases noted above. From those cases, it is apparent that Antero and Hall would be within the proper exercise of their surface use rights to actually enter upon Property Owners' land to drill wells, construct roads, haul and use heavy machinery, lay pipelines, etc. Moreover, Property Owners' complaints arising from drilling that is taking place away from their properties (i.e., dust, traffic, lights, noise, and fumes) do not equal the types of burdens that were deemed to be compatible with the surface owners' use of the surface in the cases cited above. This is particularly so where Property Owners have claimed no damage to their surface estates caused by wells that are not located on their property. Property Owners' own expert indicated that the burden being imposed on Property Owners is not substantial when he concluded his report by stating, "each family with whom I met recounted exactly the types of impacts to their health, to their peace and serenity, and to the continued use, enjoyment and value of their property described in the growing literature and *to be expected from 'normal' shale gas operations*." (Emphasis added).[29]

---

[29] Property Owners also point out that Antero has been the subject of various Notices of Violations, Cessation Orders, and Orders for Compliance issued by the West Virginia Department of Environmental Protection, the United States Environmental Protection Agency, and the United States Army Corps of Engineers related to certain well pads at issue in this case. We have reviewed these documents, and we find they simply are not related to the types of property use claims that remain at issue in this appeal. Thus, they do not provide evidence to support the existence of a genuine issue of material fact regarding the alleged burden to Property Owners caused by Antero's and Hall's activities.

Antero, through its expert, presented evidence that the effects of horizontal drilling that is not carried out on Property Owners' land actually minimizes the disruption they would otherwise experience from multiple vertical wells constructed on their properties. This is so because significantly more vertical wells would be needed, and each well would require its own well pad, lease road, and pipeline, all of which would be constructed on Property Owners' land.[30] In light of this evidence, it was incumbent upon Property Owners to present evidence that they were being substantially burdened.

> If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

Syl. pt. 3, *Williams v. Precision Coil, Inc.*, 194 W. Va. 52, 459 S.E.2d 329 (1995). Moreover, we have explained that "the party opposing summary judgment must satisfy the burden of proof by offering more than a mere 'scintilla of evidence,' and must produce evidence sufficient for a reasonable jury to find in a nonmoving party's favor." *Painter v. Peavy*, 192 W. Va. at 192-93, 451 S.E.2d at 758-59 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986)). Property Owners failed to satisfy their obligation to present evidence that they were being substantially burdened.

---

[30] For additional commentators who have concluded that horizontal drilling minimizes the disruption to surface estates, see *supra* note 26.

In summary, Property Owners have failed to establish a genuine issue of material fact as to either *Buffalo Mining* factor. They have failed to present evidence that the activities of which they complain are not reasonably necessary for Antero and Hall to develop the Marcellus shale, and they also have failed to present evidence that they are being substantially burdened by these activities, which arise from the extraction of oil and gas from the Marcellus shale using wells that are not located on their properties, and that have caused no damage to their surface estates. Property Owners have simply failed to meet their burden to produce sufficient evidence in this case to overcome summary judgment. Accordingly, we affirm the MLP's grant of summary judgment in favor of Antero and Hall. [31]

---

[31] Insofar as we resolve this matter based upon existing principles of law, we decline Property Owners' invitation to rule in their favor based upon public policy grounds. Such an argument is more properly addressed to our State Legislature. *See* Syl. pt. 2, in part, *Huffman v. Goals Coal Co.*, 223 W. Va. 724, 679 S.E.2d 323 (2009) ("It is the duty of the Legislature to consider facts, *establish policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal Constitutions*." (emphasis added)).

**IV.**

**CONCLUSION**

Based upon the foregoing analysis, we affirm the MLP's order of January 11, 2017.

Affirmed.