RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0092p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

EOG RESOURCES, INC.,

         *Plaintiff-Appellee*,

    *v.*

LUCKY LAND MANAGEMENT, LLC,

         *Defendant-Appellant*.

No. 24-3211

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:23-cv-04232—Edmund A. Sargus Jr., District Judge.

Argued: February 5, 2025

Decided and Filed: April 14, 2025

Before: THAPAR, NALBANDIAN, and DAVIS, Circuit Judges

───────────────

## COUNSEL

───────────────

**ARGUED:** Daniel P. Corcoran, THEISEN BROCK, Marietta, Ohio, for Appellant. Christopher J. Baronzzi, PORTER, WRIGHT, MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellee. **ON BRIEF:** Daniel P. Corcoran, THEISEN BROCK, Marietta, Ohio, for Appellant. Christopher J. Baronzzi, Robert J. Karl, Kyle C. Gilliam, PORTER, WRIGHT, MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellee.

───────────────

## OPINION

───────────────

NALBANDIAN, Circuit Judge. Lucky Land Management owns property in Ohio. EOG Resources has drilling rights to the oil and gas under that property. The two couldn't agree on whether EOG's rights to drill included the right to drill from Lucky Land's surface out to

adjacent properties as well.  So EOG sued.  EOG then asked the district court to grant a preliminary injunction letting the company access the land to cut down trees and start constructing drills.  The district court did so, finding that EOG would probably succeed on the merits.

We disagree.  Lucky Land has the better reading of oil-and-gas law; generally speaking, your leased drilling rights don't let you use the land's surface to drill into neighboring lands, too.  What's more, EOG wouldn't have suffered any irreparable injury if it had to wait while the litigation progressed.  And preliminary injunctions aren't shortcuts to the merits—by preventing irreparable injuries, they simply preserve the court's ability to issue meaningful final relief at the end of the case.  So they aren't appropriate when there's no prospect of irreparable harm.

Because neither the merits nor the equitable considerations favored EOG, we reverse.

## I.

Brian Lucky runs Lucky Land Management, which buys, develops, and flips real estate.  In 2022, Lucky Land bought a 313-acre rural property in Ohio for $720,000.  Brian worked to develop it into a deer hunting site, spending hundreds of thousands of dollars to build access roads through the land, construct an entrance gate, dam springs to create watering holes, plant special grasses, cut hunting trails, and develop food plots (cleared, planted areas meant to attract deer).  He intended the food plots to be the property's main attraction and a primary selling point for potential purchasers.  He invested around $300,000 just to clear and develop the plots.  Between the purchase price and the development costs, he put well over a million dollars into the land.

Title to the oil and gas below the property was severed from the rest of the estate in the 1950s.  The then-owner conveyed the land but reserved the oil and gas as follows:

> The Grantor . . . hereby excepts from the above described real estate and reserves unto itself, its successors and assigns, any and all oil, petroleum and natural gas, and all rents and royalties therefrom, and rights thereto, conveyed to or acquired by it under or by virtue of the above mentioned deed; together with the right to enter in and upon the above-described real estate and prospect for, drill, recover and remove the oil, petroleum and natural gas, and all necessary and proper rights

in connection therewith; provided, however, that the rights herein excepted and reserved shall not be exercised in such manner as to interfere with the mining and removal of the coal in and under the above-described real estate.

R. 2-2, Severance Deeds, p.2–9, PageID 29–36.  Today, EOG Resources has leased the rights to drill for the oil and gas from the original grantor's successor-in-interest.

In early 2023, EOG approached Lucky Land about accessing the land to drill.  The parties negotiated for months but could not agree on the scope of EOG's drilling operations.  Lucky Land had been aware of the severance but had envisioned the mineral-estate owner building conventional vertical drills on the surface.  EOG, though, wanted to build modern, larger horizontal drills, and it wanted to use them to produce oil and gas from thousands of neighboring acres.

Vertical drills go straight down.  Horizontal drills do more; they head down and then sideways, vastly increasing how much of an underground reservoir one drill can reach.  1 Williams & Meyers, *Oil and Gas Law* § 104, LexisNexis (database updated Nov. 2025).  Horizontal drills are more efficient, since one can tap thousands of acres that would otherwise take many vertical drills to access.

A single horizontal drill pad, though, runs larger than a single vertical drill pad.  So while a few larger horizontal drills take up less overall space than many vertical drills, one horizontal drill pad disrupts more space in the immediate area than one vertical pad does.  *See* Joshua P. Fershee & S. Alex Shay, *Horizontal Drilling, Vertical Problems: Property Law Challenges from the Marcellus Shale Boom*, 49 J. Marshall L. Rev. 413, 416–17 (2015); R. 65, Hr'g Tr., p.101, PageID 1865 (EOG's witness describing how one horizontal pad takes up 8.5 acres and a vertical one takes up roughly 2 acres).  That's why surface owners commonly resist horizontal drills, arguing that they unreasonably burden the land.  Fershee & Shay, *supra*, at 417–18.

Lucky Land objected to EOG's plan to use the deer-hunting property as a central hub from which to drill horizontally under adjoining lands.  Brian Lucky testified that the horizontal pads—which EOG wanted to build around the food plots—would cause the land to lose about half its $1.5 million value and would "virtually bankrupt" his company.  R. 65, Hr'g Tr.,

p.264–65, PageID 2028–29.  So Lucky Land refused to let EOG onto the property to begin construction.

EOG sued.  After a hearing, the district court preliminarily enjoined Lucky Land from keeping EOG out and had EOG pay Lucky Land $100,000 in "due regard" for the surface disruption.  *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, No. 2:23-cv-4232, 2024 WL 1193824, at *13 (S.D. Ohio Feb. 23, 2024).

The preliminary injunction also ordered the parties to negotiate over a viable location for the drilling sites.  *Id.*  EOG's proposed horizontal drill pads would take up between 35 and 45 acres on the 313-acre property's surface, and EOG insisted on building them around where the deer food plots sat (the property's prime location, on a ridge high and dry above the wetlands).  Lucky Land would not agree.  It asked EOG to site the drills away from the food plots.  The district court didn't follow up or adjudicate where the drills would go, and EOG had the preliminary injunction in hand, so the company entered the property and began clearing trees around the food plots.

Lucky Land appealed.  A motions panel granted a stay of the preliminary injunction pending appeal, but not before EOG deforested around 35 acres.

**II.**

To secure a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Because a preliminary injunction "is an 'extraordinary' equitable remedy that is 'never awarded as of right,'" the plaintiff must make a "clear showing" that these factors favor him.  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) (quoting *Winter*, 555 U.S. at 24).

We review preliminary injunction grants for abuse of discretion, though we review the underlying legal analysis de novo and factual findings for clear error.  *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024).  A district court abuses its discretion by identifying

the wrong legal standard, improperly applying the right one, or relying on clearly erroneous factual findings. *Id.*

### III.

*Likelihood of Success on the Merits*.  Ohio law governs this diversity case.  No one disputes that a driller with rights to a property's oil and gas has the right to enter the land's surface to drill under that particular property.  The merits here turn on whether the driller can also use that surface for drilling operations that extend under neighboring lands where he has other mineral interests.[1]  Put simply, if you own the oil and gas under tract A and tract B, can you use A's surface to get at B's subsurface?

### A.

When you own land, "you don't always own everything from the surface to the center of the Earth."  *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1253 (10th Cir. 2014) (Gorsuch, J.).  Property owners often sever the surface estate from the mineral estate, selling one and keeping the other.  Decades later, the new owners of the surface and the underground resources might find themselves at odds, disagreeing over how they're supposed to share the property.  "Tension between the [surface] owner . . ., who seeks to maximize the value of the surface, and the [mineral] owner . . ., who seeks to maximize the value of the minerals, is inevitable."  *Snyder v. Ohio Dep't of Nat. Res.*, 18 N.E.3d 416, 420 (Ohio 2014).  The surface owner "cannot reasonably claim that no minerals can be mined," just as the mineral owner "cannot reasonably expect to have unfettered access to the minerals."  *Id.*  Severed estates "can invite confusion—and litigation."  *Entek*, 763 F.3d at 1253.

---

[1]This case rests on a first-order assumption—that the driller has the separate rights (as EOG does here) to the oil and gas under the neighboring lands into which the drilling operations will pierce.  If he didn't, of course, that would be a subsurface trespass.  *See* 1 Nancy Saint-Paul, *Summers Oil and Gas* § 2.4, Westlaw (database updated Oct. 2024).  We aren't concerned as much with whether the driller has the mineral rights under tracts A, B, and C, as we are with whether the driller can use A's *surface* to send a drill under B and C to produce oil and gas.

This isn't a rule-of-capture case, either.  A driller with mineral rights to tract A can drill beneath tract A to produce oil and gas even if the underground pool extends across multiple tracts and the oil and gas beneath B and C then flow over to A.  We aren't concerned here with fugitive resources crossing property lines—we're concerned with the physical drilling apparatus crossing property lines from A's surface down to B's and C's subsurface.

Rights to underground resources are useless without a way to access them. So a severed mineral estate generally includes "rights to use of the surface as are reasonably necessary" for mineral production. *Chesapeake Expl., LLC v. Buell*, 45 N.E.3d 185, 190 (Ohio 2015) (quoting *Quarto Mining Co. v. Litman*, 326 N.E.2d 676, 684 (Ohio 1975)). In other words, the mineral estate comes with an easement over the surface estate. Parties can create, define, and limit these easements by express contractual language in deeds or leases. And if they don't, the law implies an easement by necessity anyway. *See* 68 Ohio Jur. 3d, *Mines and Minerals* § 17, Westlaw (database updated Feb. 2025) (citing *Buell*, 45 N.E.3d 185).

**1.**

Ohio law presumes that a severance deed grants an easement to use the surface only in connection with mineral production under that surface. Anything more exceeds the scope of the easement and is an unauthorized surface use. In 1954, around the time the deeds in this case were executed, one Ohio court (quoting the treatise *American Jurisprudence*) described how the "owner of the minerals obtains, either by express terms of the conveyance or by necessary implication therefrom, a right of entry or access to the minerals over and through the surface," but observed that the mineral owner wouldn't have "the right to use the surface in aid of mining on adjoining premises." *Franklin v. Callicoat*, 119 N.E.2d 688, 692 (Ohio Ct. Com. Pl. 1954). And that's still the law today. *See* 68 Ohio Jur. 3d § 17 ("The mineral owner's use of the surface generally is restricted to that necessary to the production of the minerals underlying it. . . . The rights to use of the surface exist only in reference to the land overlying the minerals granted.").[2]

This presumption, though, is just that. Drafters can overcome it with clear language, and when they want to do so, they know how to be specific. In *Eclipse Resources-Ohio, LLC v. Madzia*, for example, we considered an oil-and-gas lease that gave the lessee-driller (1) the right to "all of the oil and natural gas from any source," (2) the right "to drill for" that oil and gas, and (3) the right to transport across the land oil and gas "from the subject lands and other lands." 717 F. App'x 586, 588 (6th Cir. 2017) (emphasis omitted). Applying Ohio law, we held

---

[2]Ohio courts routinely consult *Ohio Jurisprudence 3d*. *See, e.g.*, *Bob Bay & Son, Co. v. Circle Inv. Corp.*, 114 N.E.3d 268, 273–74 (Ohio Ct. App. 4th Dist. 2018); *State v. Lykins*, 102 N.E.3d 503, 513 (Ohio Ct. App. 4th Dist. 2017).

that the lease "unambiguously" gave the driller the right to use the surface to send drills under neighboring properties.  *Id.* at 595; *cf. Pittsburg & Midway Coal Mining Co. v. Shepherd*, 888 F.2d 1533, 1534–36 (11th Cir. 1989) (lease overcame presumption by specifying that the grantee could use the surface for oil and gas production from the "[granted] lands or any other lands" (emphasis omitted)).

But short of similar language, the default rule kicks in to prevent mineral owners from leveraging one surface to drill or mine under others.  This rule isn't a barrier to modern and efficient drilling methods—if a driller wants to go horizontal, he simply has to negotiate with the landowner.  After all, "we expect parties to bargain around a judicial assignment of legal rights if the assignment is inefficient."  *Walgreen Co. v. Sara Creek Prop. Co., B.V.*, 966 F.2d 273, 276 (7th Cir. 1992) (Posner, J.) (citing R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960)).

The one Ohio case identified by the parties that deals with horizontal drilling fits within this rule.  In *Jewett Sportsmen & Farmers Club, Inc. v. Chesapeake Exploration, LLC*, the severance deed did not expressly reserve a right to use the surface in connection with operations under other lands.  No. CVH-2011-0113, at 2–3 (Ohio Ct. Com. Pl. Jan. 17, 2012).  The court thus held that the deed did "not authorize [the drillers] to use any portion of the premises . . . to access or to recover oil, gas, or other substances from areas outside the subject premises."  *Id.* at 13.

**2.**

The general law of oil and gas, including secondary authorities and leading cases from other jurisdictions, confirms our conclusion.

We apply the forum state's law in diversity cases.  *SHH Holdings, LLC v. Allied World Specialty Ins. Co.*, 65 F.4th 830, 836 (6th Cir. 2023); 28 U.S.C. § 1652.  But when we apply Ohio law, it makes sense to follow not just what the Ohio courts decide, but also *how* they decide.  *See Madzia*, 717 F. App'x at 594 (following the Ohio Supreme Court's use of dictionaries in contract interpretation); *cf.* Abbe R. Gluck, *Intersystemic Statutory Interpretation: Methodology as "Law" and the* Erie *Doctrine*, 120 Yale L.J. 1898, 1971 (2011).  In oil-and-gas

cases, the Ohio Supreme Court consults treatises and other state supreme courts for advice. *See Peppertree Farms, LLC v. Thonen*, 188 N.E.3d 1061, 1067–68 (Ohio 2022) (examining treatises); *Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, 376–78 (Ohio 1974) (citing the Pennsylvania Supreme Court and West Virginia Supreme Court); *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 955 (Ohio 1996) (citing Pennsylvania, West Virginia, Virginia, Missouri, Colorado, and Texas courts); *cf. State v. Castagnola*, 46 N.E.3d 638, 655 (Ohio 2015) ("[W]e have consistently looked to out-of-state cases when considering issues of first impression and have adopted the reasoning in those cases when the opinions were persuasive and on point."). So when discerning Ohio law, we may do the same.

These persuasive authorities—treatises, cases, scholarly commentary—virtually unanimously support the proposition that a mineral owner may not use the surface to drill under neighboring lands without the surface owner's consent.

**a.**

Start with treatises. Williams & Meyers's *Oil and Gas Law* is "arguably the foremost authoritative treatise" on oil and gas law. *Smith v. Steckman Ridge, LP*, 590 F. App'x 189, 194 n.5 (3d Cir. 2014) (internal quotation marks omitted); *see also In re ATP Oil & Gas Corp.*, 888 F.3d 122, 127 (5th Cir. 2018) (calling it a "leading treatise"). The Ohio Supreme Court and the U.S. Supreme Court have relied on it. *See Peppertree Farms*, 188 N.E.3d at 1068; *Comm'r v. Engle*, 464 U.S. 206, 209 n.4 (1984). Williams & Meyers says this about the "use of [a] surface in connection with operations on other premises":

> The usual express easements and implied surface easements of a mineral owner or lessee are limited to such surface [use] as is reasonably necessary for exploration, development and production on the premises described in the deed or lease. Of course the instrument may expressly grant easements in connection with operations on other premises; such an express provision is common in joint or community leases or instruments which authorize pooling and unitization. . . . Where the severance of the mineral estate takes place without there being an extant lease with a pooling clause, the operator may not use the surface estate for the location of a well pad where there are horizontal laterals that extend beyond the boundaries of the lands that were severed. *Absent such express provision or statutory authority, clearly the use of the surface by a mineral owner or lessee in*

> *connection with operations on other premises constitutes an excessive user of his surface easements.*

1 Williams & Meyers § 218.4 (emphasis added) (footnotes omitted). The treatise adds that "there is little case authority on the matter," but notes that the lack of caselaw itself reflects the rule's operation. *Id.* "The reason for the dearth of such authority," the treatise states, "is that [this rule] appears generally assumed and hence operators who desire to engage in such activities have sought to obtain from the surface owners an express easement." *Id.*

Williams & Meyers also lists several activities that a "reasonable surface user" may carry out. *Id.* § 218.7. These include clearing land for roads to the drilling sites, taking water necessary for mineral production, and housing employees on the premises. *Id.*[3] By contrast, an "excessive user of surface easements" is one who "use[s] a portion of the surface in connection with operations on other premises." *Id.* § 218.8.

Other treatises agree. Dean Eugene Kuntz's work explains:

> If the title to all minerals has been severed, the mineral owner is entitled to the use of the surface for the purpose of extracting minerals from such land. His right to use the surface for such purpose is necessarily exclusive. Such mineral owner should not have the right to use the surface for other purposes, such as the purpose of removing minerals from another tract of land.

---

[3] The treatise does list as an acceptable surface use "hydraulic fracturing and horizontal drilling techniques to exploit the mineral estate," though it's not apparent at first glance what context the treatise is referring to. 1 Williams & Meyers § 218.7. For this proposition the treatise cites one West Virginia case, *Andrews v. Antero Resources Corp.*, 828 S.E.2d 858 (W. Va. 2019). And *Andrews* considered horizontal drilling in a different factual context.

The *Andrews* plaintiffs complained of "a variety of annoyances, inconveniences, and discomforts arising from the *off-site* drilling activities of Antero." *Id.* at 871 (emphasis added). It wasn't any horizontal drilling on the plaintiffs' *surface* that bothered them; it was the effects of horizontal drilling next door. Antero, which had the oil and gas rights to the plaintiffs' land, was horizontally drilling under them from the neighboring surface. *See id.* at 860 ("These surface owners contend that their use and enjoyment of their land is being improperly and substantially burdened by horizontal wells being used to develop the Marcellus shale underlying their properties, even though the wells are not physically located on any of their properties." (footnote omitted)). The court found that Antero's operations made reasonable use of its right to produce the oil and gas under the plaintiffs' land. *Id.* at 873. Antero could've entered their surface directly and built vertical wells on it, but didn't. And the dust, light, noise, and fumes from the horizontal drilling next door was at least comparable, and likely less than, the burden that vertical wells would've imposed. *Id.* at 868–69.

*Andrews* doesn't speak to a situation in which a driller wants to horizontally drill from a plaintiff's surface. So *Andrews*—and thereby Williams & Meyers—doesn't alter the general presumption that a mineral-estate easement doesn't include a surface-use right to horizontally drill off-site.

1 Eugene Kuntz, *A Treatise on the Law of Oil and Gas* § 12.8, LexisNexis (database updated June 2024) (footnote omitted); *see also Peppertree Farms*, 188 N.E.3d at 1067–68 (citing Kuntz). *Summers Oil and Gas* echoes the same point: "An oil and gas lessee may not use the demised land as a base for operations on other lands, unless the lease or a separate agreement expressly so provides." 4 Nancy Saint-Paul, *Summers Oil and Gas* § 41:4, Westlaw (database updated Oct. 2024) (footnote omitted). So do generalist treatises, like *American Jurisprudence*: "In the absence of an agreement to the contrary, the owner of minerals underlying a tract of land has no right to use the surface thereof in aid of mining operations on adjacent, adjoining, or other tracts of land." 53A Am. Jur. 2d, *Mines and Minerals* § 357, Westlaw (database updated Jan. 2025) (footnote omitted). And *Corpus Juris Secundum*: "[A] mineral owner generally has no right to use the surface of one tract to aid in the mining of another tract, even though such owner owns the minerals under both." 58 C.J.S., *Mines and Minerals* § 234, Westlaw (database updated Dec. 2024).

**b.**

Next, consider out-of-state caselaw. Nearly all jurisdictions to address the issue have held that a mineral owner must secure express consent to use the surface for drilling operations under other lands. *See, e.g.*, *Russell v. Texas Co.*, 238 F.2d 636, 642 (9th Cir. 1956) ("It is a well established principle of property law that the right to use the surface of land as an incident of the ownership of mineral rights in the land, does not carry with it the right to use the surface in aid of mining or drilling operations on other lands."); *Ross Coal Co. v. Cole*, 249 F.2d 600, 604–05 (4th Cir. 1957) (same); *Wiser Oil Co. v. Conley*, 346 S.W.2d 718, 722 (Ky. Ct. App. 1960) (same); *Tutwiler v. Etheredge*, 231 So. 2d 93, 94–95 (Ala. 1970) (same); *Mountain Fuel Supply Co. v. Smith*, 471 F.2d 594, 596 (10th Cir. 1973) (same); *Pharaoh Oil & Gas, Inc. v. Ranchero Esperanza, Ltd.*, 343 S.W.3d 875, 881 (Tex. Ct. App. 2011) (same); *Krenz v. XTO Energy, Inc.*, 890 N.W.2d 222, 237 (N.D. 2017) (same).

The West Virginia Supreme Court is one of the latest courts to reiterate this "classical rule of property jurisprudence" in the horizontal drilling context. *EQT Prod. Co. v. Crowder*, 828 S.E.2d 800, 811 (W. Va. 2019). In *Crowder*, an oil-and-gas lessee sought to horizontally drill through over 3,000 acres from the plaintiffs' surface, a tract of 351 acres. *Id.* at 804. When

the plaintiffs denied the drilling company's request, the company entered the land anyway, cleared forty acres, built the well pads, and drilled for miles underground. *Id.* But the West Virginia Supreme Court held that a "mineral owner or lessee does not have the right to use the surface to benefit mining or drilling operations on other lands, in the absence of an express agreement with the surface owner permitting those operations." *Id.* at 810. "Using the surface to extract minerals elsewhere, without the permission of the surface owner," the court found, "is a trespass." *Id.* at 811. If the drillers wanted to use one surface "to access minerals under neighboring land," they had to "reach a separate agreement with the surface owner." *Id.*

**c.**

The scholarly commentary agrees, too. Around the time the deeds in this case were executed, one writer explained:

> [C]ourts have looked primarily to the instrument of agreement between the parties, and finding there no express or necessarily implied permission to use the surface in mining any but the subjacent minerals, have held that such right is not incidental to the grant or reasonably necessary to its exercise, and have furthermore characterized the mineral holder a trespasser to the extent of his "outside" mining.

W.C. Crais III, *Right of Owner of Title to or Interest in Minerals Under One Tract to Use Surface, or Underground Passages, in Connection with Mining Other Tract*, 83 A.L.R. 2d 665 § 2 (1962). He reasoned that the "use of the facilities on [the surface] for mining any but the immediately subjacent minerals places an additional onus on [the surface owner's] already burdened estate," including "postponed reversionary interests, and actual physical damage to the land by reason of the expanded operations." *Id.* It was considered unfair to require the surface owner to accommodate this extra burden without additional compensation.

A wide scholarly consensus, spanning over half a century from the time when the severance deeds were executed to the present, concurs. *See* William B. Browder, *The Dominant Oil and Gas Estate—Master or Servant of the Servient Estate*, 17 Sw. L.J. 25, 46 (1963) ("[A] lessee does not have the right to use the surface of the premises in aid of drilling operations on other lands."); Donald N. Zillman & J. Russell Tyler, Jr., *The Common Law of Access and Surface Use in Mining*, 1 J. Min. L. & Pol'y 267, 288 (1985) ("[T]he contemporary position is

that the mineral owner is not entitled to use the surface for the benefit of other mineral ventures without express permission."); Steve Ruffatto & Kemp Wilson, *A Scrivener's Concerns in the Creation and Transfer of Severed Mineral and Royalty Interests*, 9 Pub. Land L. Rev. 31, 52 (1988) (same); John D. McKinnis, *Directional Drilling, Subsurface Trespass, and Conversion*, 4 J. Min. L. & Pol'y 235, 243 (1988) (same); Jason A. Proctor, Note, *The Legality of Drilling Sideways: Horizontal Drilling and Its Future in West Virginia*, 115 W. Va. L. Rev. 491, 519 (2012) (same, and cited by the West Virginia Supreme Court in *Crowder*, 828 S.E.2d at 809); Christopher S. Kulander & R. Jordan Shaw, *Comparing Subsurface Trespass Jurisprudence—Geophysical Surveying and Hydraulic Fracturing*, 46 N.M. L. Rev. 67, 73 (2016) (same).

In sum, under general oil-and-gas law principles, a mineral estate does not bring with it the surface-use right to horizontally drill outside the property's boundaries unless the contracting parties specify that it does. If they don't, then the future mineral owner must obtain the surface owner's consent.

**B.**

How do these principles apply here? We start with the severance deeds' language. The deeds reserved the "oil, petroleum and natural gas . . . together with the right to enter in and upon the . . . real estate . . . and all necessary and proper rights in connection therewith." R. 2-2, Severance Deeds, p.2–9, PageID 29–36. Pretty standard stuff.[4] Nothing unusual—and nothing about off-site subsurface access.

The deed does not expressly grant the right to use the surface for drilling under other lands. Even EOG concedes as much. Appellee Br. at 21 ("Here, the one-sentence reservation of rights in the Severance Deeds does not expressly authorize horizontal drilling and production from neighboring properties . . . ."). And that right typically isn't in the cluster of rights that accompanies a surface easement; it's not a "necessary" or "proper" right that the original buyer and seller would have contemplated. So to prevail, EOG would have to convince us that Ohio

---

[4]Severance deeds and oil-and-gas leases commonly grant "reasonable," "necessary," or "customary" surface privileges.

law is an outlier and rejects the nearly century-long consensus of courts, treatises, and scholars. No Ohio authority suggests that, though. Thus, we do not find EOG likely to succeed on the merits.

The district court erred in concluding otherwise. For starters, the district court relied on Williams & Meyers but overlooked the treatise's discussion of the relevant rule. The court cited the treatise's list of acceptable surface uses, like taking water, building access roads, housing employees, and disposing of waste material in pits, and reasoned that EOG's proposed projects were similarly reasonable. *EOG*, 2024 WL 1193824, at *9 (citing 1 Williams & Meyers § 218.7). Yet the court missed what the treatise said in the next section—that the "use of a portion of the surface in connection with operations on other premises" exceeds the easement's scope. 1 Williams & Meyers § 218.8; *see also id.* § 218.4 (same).

The district court's analysis was also structurally flawed. The district court first stated the proper legal inquiry—whether EOG was likely to succeed on the merits. *EOG*, 2024 WL 1193824, at *4. It then asked whether EOG had an express right to horizontally drill from Lucky Land's surface, and it concluded that the deed was "ambiguous" because "the reservation of rights is susceptible to more than one reasonable interpretation." *Id.* at *5–6.[5] Finding no express right, the district court then asked whether EOG might have an implied right. *Id.* at *8. So far, so good.

Then, abruptly switching tracks, the district court abandoned its analysis. It stated that it "need not make an express finding as to EOG's implied right," and moved on to ask whether EOG's proposed surface use gave "due regard" to Lucky Land's rights. *Id.* at *9. It decided that the horizontal wells would not exceed what was "reasonable use" of the surface. *Id.* So, finding that EOG had given "due regard" and ordering EOG to pay Lucky Land $100,000 as "additional due regard," the court determined that EOG was likely to succeed on the merits. *Id.* at *9–10.

---

[5]Ohio courts construe contract ambiguity against the drafter. *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996). The drafter here was the original grantor, EOG's predecessor-in-interest. So if the deeds were ambiguous, as the district court thought, the court probably should have resolved the ambiguity against EOG and found that EOG did not have any right to use Lucky Land's surface to horizontally drill.

Whether EOG showed "due regard" wasn't the right question—at least not yet. That inquiry, which the district court drew from the Ohio Supreme Court's decision in *Snyder v. Ohio Department of Natural Resources*, 18 N.E.3d at 420, might help us balance the parties' competing rights, but it's less helpful for determining what rights the parties have in the first place. You can't generate a new right simply by showing "due regard" (whatever that means) for your adversary. As discussed, using the surface to drill other properties isn't typically part of the bundle of sticks you receive with a severance-deed easement. It's a "right" you don't have (by default), and you can't make reasonable use of a right you don't have. The district court's decision ordering what looks like a constructive settlement payment for this new right didn't make EOG any more or less likely to succeed on the merits, either. Lucky Land, not a court, can decide whether to broaden the easement's scope and how much that's worth.

EOG makes several arguments in response. None persuade us.

First, EOG latches onto *Snyder*, in which the Ohio Supreme Court found that strip mining coal from the land's surface could be a reasonable surface use.[6] *Id.* at 420–21. (The court reversed summary judgment for the surface owner and remanded for more factfinding.) EOG argues that strip mining is analogous to horizontal drilling. While *Snyder* looks a little like this case, the differences vitiate the similarities.

For one, strip mining was a well-known technique at the time of the *Snyder* severance deed's execution and therefore in the signatories' contemplation. *Id.* at 421. Here, horizontal drilling wasn't. But more importantly, the *Snyder* parties were litigating the extent of the mineral owner's rights *within the same severed estate*. If you have the right to take all the coal from the entire property, it's not inconceivable that you could take coal from the surface, even if the existence of surface coal might come as a surprise. That tells us little, though, about a mineral owner's off-site privileges (or lack thereof).

---

[6]Coal mining traditionally involved tunnels deep underground, but modern strip mining uses machines to "strip" the surface soil and extract shallow, near-surface coal, destroying the surface in the process. *See Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, 377 (Ohio 1974).

Second, EOG argues that a ruling against it would destroy longstanding pooling and unitization principles. The short answer is that it wouldn't. The longer story requires a brief word on what these principles are.

Oil-and-gas fields face a collective-action problem. Thanks to the rule of capture,[7] each landowner has an incentive to drill as much as possible before his neighbors drain the reservoir. *See Kerns v. Chesapeake Expl., LLC*, 762 F. App'x 289, 291 (6th Cir. 2019). When an oil field has too many drills, the reservoir loses its natural drive (the pressure forcing oil and gas up), leaving much of the oil out of reach. *Id.* Erecting more and more drills also "necessitates the expenditure of capital, well in excess of that need to efficiently drain the pool of most of its oil and gas." 1 Bruce M. Kramer & Patrick H. Martin, *The Law of Pooling and Unitization* § 2.02, LexisNexis (database updated Sept. 2024). Simply put, everyone would pay more to get less. American law has long taken a "Drill, Baby, Drill" approach to energy production, but has also sought to avoid the inefficiencies and lost opportunities that accompany a tragedy of the commons.

The law responds to this quandry in a few ways. Many states, including Ohio, use the doctrine of correlative rights to limit the rule of capture. The doctrine requires landowners to drill without committing waste or negligence, which would deprive others of the chance to drill the same resources. *Barnes v. Rsrv. Energy Expl.*, 68 N.E.3d 133, 141 (Ohio Ct. App. 7th Dist. 2016); *see also* Ohio Rev. Code Ann. § 1509.01(I) (defining correlative rights as "the reasonable opportunity to every person . . . to recover and receive the oil and gas in and under the person's tract . . . without having to drill unnecessary wells or incur other unnecessary expense"); Ohio Rev. Code Ann. § 1509.20 (requiring drillers to use "every reasonable precaution" and to "prevent waste"). The law also imposes spacing requirements on drilling operations, limiting how closely wells can be spaced. *See Kerns*, 762 F. App'x at 291–92; Ohio Rev. Code Ann. § 1509.24.

Pooling and unitization work to prevent waste, facilitate efficient oil and gas recovery, protect correlative rights, and protect small landowners from spacing requirements. When

---

[7]Oil and gas are fugitive resources subject to the rule of capture. *Barnes v. Rsrv. Energy Expl.*, 68 N.E.3d 133, 141 (Ohio Ct. App. 7th Dist. 2016).

properties have a common resource below, they can be "pooled" or "unitized" into one tract with a coordinated or centralized drilling apparatus and profits shared on a prorated basis. Pooling "refers to the aggregation of two or more tracts of land into a drilling unit of prescribed size." 6 Williams & Meyers § 901. Unitization "refers to the combination of most, if not all, of the separate tracts in the field into one tract so that the reservoir may be operated without regard to surface property lines." *Id.* When a field is unitized, drillers can then plan their operations in the most efficient manner without "worrying about a checkerboard of titles and leases." *Entek*, 763 F.3d at 1256. Landowners can voluntarily pool or unitize, or the state can compel it. *See* Ohio Rev. Code Ann. §§ 1509.25–28.

To unitize a field and become the unit operator, a private company must secure the consent of the owners of 65% of the land and get approval from the Ohio Department of Natural Resources. *Id.* § 1509.28(A)(1). EOG is apparently planning a unit, but as the company made clear to the district court, and as it discussed at oral argument, it is not a unit operator yet and is still negotiating land-use agreements with surrounding landowners. So while unitization might change the calculus for the traditional easement package, since the unit operator has to worry less about surface boundaries, that wouldn't help EOG now. In short, nothing in our decision undermines the law of pooling and unitization because that law hasn't kicked in yet.[8]

EOG has not shown that it is likely to succeed on the merits.

**IV.**

*Irreparable Injury*. Even if a plaintiff has shown a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). A plaintiff must also show that some irreparable harm will take place without the court's immediate intervention.

---

[8]As a fallback, EOG asks us to certify to the Ohio Supreme Court. Federal courts may certify state-law questions to state courts "when the question is new and state law is unsettled." *In re Amazon.com, Inc.*, 942 F.3d 297, 300 (6th Cir. 2019) (order) (internal quotation marks omitted). The decision to do so lies in the court's "sound discretion." *Id.* (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)). We don't find this case's issues unsettled, so we see no need to certify.

Courts often describe the preliminary-injunction analysis as a balancing act. From time to time, though, some courts have let the language of balancing creep so that they let a strong showing on one or two factors—say, the merits—eliminate the need for any showing on another—say, irreparable injury. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (describing this trend). We've tried to root out this tendency before, *see id.*, but it persists. The district court here, for example, relying on one of our old cases, asserted that the four factors "are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *EOG*, 2024 WL 1193824, at *4 (quoting *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). And the court granted the preliminary injunction even though it found that EOG wasn't going to suffer any irreparable harm. *Id.* at *11.

That was erroneous. Any of our old cases that might have endorsed that approach were abrogated by the Supreme Court in *Winter v. Natural Resources Defense Council*, 555 U.S. 7; *see also D.T.*, 942 F.3d at 328–29 (Nalbandian, J., concurring) (explaining how). Irreparable harm is the core of the preliminary injunction, as we and the Supreme Court have made clear before. It's true that courts "balance" the four factors, but while "the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory." *D.T.*, 942 F.3d at 327 (majority opinion). To understand why, it's worth reminding ourselves of the purpose of the preliminary injunction.

A preliminary injunction is *preliminary*. "Its purpose 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Starbucks Corp.*, 602 U.S. at 346 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). It does not conclusively resolve anything—that's what final judgment is for. The preliminary injunction simply puts the case in a holding pattern and "balance[s] the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam).

Justice Joseph Story traced a version of the preliminary injunction back to Roman law, where Praetors issued "interdicts," orders "originally interposed in the nature of an interlocutory decree between two parties contending for possession, until the property could be tried." Joseph Story, 2 *Commentaries on Equity Jurisprudence* § 866, 159 (1836). That practice makes sense and is reflected in our equitable tradition today. Cases can take months or years to decide, so

courts need interim managerial devices to stop defendants from mooting or drastically reshaping the case—"selling the disputed pet, tearing down the disputed house, exporting the disputed Vermeer." William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 170 (2023). If the sale, demolition, or export goes through, but it turns out at day's end that another party is entitled to the pet, house, or painting, the court has lost its power to make that party whole. Equity recognizes that after a certain point, you can't unscramble the eggs or put the genie back in the bottle. So without preliminary injunctions, courts—and litigants—might be left with "remed[ies] in name only, not in substance." *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 844 (1824).

The preliminary injunction thus preserves the court's power to issue meaningful final relief once the parties have litigated the merits to a final decision. As Justice Blair put it in the early days of the republic, we issue preliminary injunctions so "that an injury may not be done, which it may be out of our power to repair." *Georgia v. Brailsford*, 2 U.S. (2 Dall.) 402, 407 (1792) (opinion of Blair, J.); *see also id.* at 406 (opinion of Iredell, J.) (approving of an injunction so that "an irreparable injury may be prevented; while the adverse party, even if he ultimately succeeds, can only complain of a short delay"). Or as one scholar has put it today, the court asks "whether it needs to act now (with a preliminary injunction) to preserve its ability to act in the future" (with a permanent injunction). Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. (forthcoming 2025) (manuscript at 19).

But because this provisional equitable relief "is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits," *Camenisch*, 451 U.S. at 395, such relief "is the exception, rather than the rule," *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024). As a general rule, the law requires that "losses should remain where they fall until an adequate legal or equitable justification for shifting them has been demonstrated." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1012 (10th Cir. 2004) (McConnell, J., concurring). And a "judicial version of Hippocrates' ancient injunction to physicians—above all, to do no harm—counsels against forcing changes before there has been a determination of the parties' legal rights." *Id.*

And showing just any old injury won't do.  The injury must be *irreparable*, in the legal sense, and not every injury is irreparable.  "Irreparable" means "not fully compensable by monetary damages."  *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also Walgreen*, 966 F.2d at 275 ("'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment.").  Many injuries are quite reparable and can be compensated with money damages, the baseline remedy.  But for certain injuries, damages might be inadequate or particularly difficult to calculate.

Examples include copyright infringement or damage to reputation and loss of goodwill resulting from the breach of a noncompete agreement.  *See Hall v. Edgewood Partners Ins. Ctr.*, 878 F.3d 524, 530 (6th Cir. 2017); *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503–04 (6th Cir. 2022).  Others include cases where a defendant tried to make himself insolvent before a judgment collection by transferring assets, or where minority shareholders tried to sell shares in a way that would cause the corporation to permanently lose its grandfathered tax status.  *See McGirr v. Rehme*, 891 F.3d 603, 613–14 (6th Cir. 2018); *A.W. Chesterton Co. v. Chesterton*, 128 F.3d 1, 8–9 (1st Cir. 1997).  How do you measure the effect of a lost tax status or collect from an insolvent debtor?  In each of these examples, without an interim freeze-in-place order, the court could lose its ability to right any wrongs.

Preliminary injunctions aren't shortcuts to a final merits decision.  They serve the temporary, case-management goal of preventing irreversible mischief during the litigation.  That's why our circuit has long held that a "district court abuses its discretion when it grants a preliminary injunction without making specific findings of irreparable injury to the party seeking the injunction."  *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982).  As we recently reiterated, that factor is "indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit."  *D.T.*, 942 F.3d at 327; *see also Neate*, 98 F.4th at 672 ("[W]here there is no likelihood of *either* success on the merits *or* irreparable harm, an injunction is unwarranted—regardless of the showing on the other factors." (quoting *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022)).

To whatever extent some of our old cases suggested that no factor is a strict prerequisite, the Supreme Court's 2008 *Winter* decision swept them aside. (As have our post-*Winter* decisions.) *Winter* described how a plaintiff "must" show that the four factors favor him. 555 U.S. at 20. And *Winter* clarified the standard for assessing irreparable injury, which the Ninth Circuit had thought required only a possibility of irreparable harm. 555 U.S. at 21. The Supreme Court clarified that the law "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22. No one suggested courts could do away with this factor altogether. So if "we know one thing from *Winter*, it's that a plaintiff must establish irreparable injury." *D.T.*, 942 F.3d at 329 (Nalbandian, J., concurring). Anything in circuit caselaw to the contrary has been abrogated. *See id.* at 327 (majority opinion); *Neate*, 98 F.4th at 672; *see also Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295–96 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("[T]his Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with . . . *Winter*," where "the Court ruled that the movant always must show a likelihood of irreparable harm.").

What does all this mean for EOG? The district court found that EOG probably wouldn't be irreparably harmed before final judgment, reasoning that delaying the drilling would, at worst, lead to lost profits. *EOG*, 2024 WL 1193824, at *10–11. And EOG doesn't contest this on appeal. We agree with the district court; "lost profits alone are calculable and compensable through monetary damages." *Id.* at *11 (quoting *Hall*, 878 F.3d at 530); *see also Overstreet*, 305 F.3d at 579 (lost income from job termination not irreparable, as "quintessentially reparable by money damages" (internal quotation marks omitted)). But while the district court got that much right, it misunderstood the implications of that conclusion. No irreparable harm? No preliminary injunction.

The district court thus erred in granting the preliminary injunction without any finding of irreparable injury.

## V.

*The Balance of the Equities*. Courts next turn from the harms the plaintiff might suffer to the harms the defendant might suffer, and then ask where the greatest harm would fall. We "balance the competing claims of injury[,] . . . consider[ing] the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks omitted).

The preliminary injunction did not prevent EOG from suffering irreparable injury. In fact, it caused Lucky Land—the defendant—to suffer irreparable injury. Committing waste on real property by felling trees is a classic example of irreversible damage. That's what EOG sought to do—after it secured the court's approval, it entered the property and began cutting down some 35 acres of trees. In other words, EOG essentially asked for a preliminary injunction to *cause* an irreparable injury, not to *prevent* one. That's not what preliminary injunctions are for. The balance of the equities should have weighed in Lucky Land's favor.

Real estate is special and comes with special rules. For example, because real estate is "the quintessential unique commodity," *Mich. Prot. & Advoc. Serv., Inc. v. Babin*, 18 F.3d 337, 345 (6th Cir. 1994), we presume that damages are inadequate in land-sale breach-of-contract cases and we make specific performance available, 71 Am. Jur. 2d, *Specific Performance* § 129; Douglas Laycock & Richard L. Hasen, *Modern American Remedies* 413 (5th ed. 2020). Traditionally, real estate and its constituent parts (trees, minerals) held a special place in the equitable considerations governing injunctions.

Once trees are down, they don't go back up. And replacing them is usually impossible, at least on any relevant timeline. *Cf. Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Justice Story recognized this. His treatise on equity described how "restrain[ing] the commission of every species of waste to houses, mines, [and] timber" and "prevent[ing] the wasting of assets or other property pending litigation" were among the "most ordinary objects" of an injunction. 2 Story § 872, 163–64.

Over two centuries ago, in *Bradley v. Reed*, a federal circuit court considered a case not unlike ours. 3 F. Cas. 1158 (C.C.W.D. Pa. 1800) (No. 1785). Two parties disputed title to a

piece of property and landed in federal court. But after the court heard argument, and before it could issue a decision, one party pleaded with the court to issue a preliminary injunction barring the other party from cutting down the property's valuable trees. *Id.* at 1158. The court agreed that "pending the suit, it appear[ed] extremely fit that the [party] in possession should not be permitted to strip the land of its timber." *Id.* at 1159 (internal quotation marks omitted). So the court preliminarily enjoined the felling, wanting to "prevent that irreparable mischief by [the court's] interposition." *Id.*

American courts have long held up downing trees as a prototypical irreparable injury, always on "the principle of preserving the property, until a trial at law can be had." *Parker v. Winnipiseogee Lake Cotton & Woolen Co.*, 67 U.S. (2 Black) 545, 552 (1862). In *Erhardt v. Boaro*, for example, the Supreme Court ordered a preliminary injunction reinstated against certain defendants in a suit charging them with trespass on land and exploiting its resources. 113 U.S. 537, 538–39 (1885). The Court explained how it was "common practice in cases where irremediable mischief is being done or threatened, going to the destruction of the substance of the estate, such as . . . the cutting down of timber, . . . to issue an injunction, though the title to the premises be in litigation." *Id.* at 539.

Or consider *Lownsdale v. Gray's Harbor Boom Co.* 117 F. 983 (C.C.D. Wash. 1902). There, the federal circuit court described how one party's "destroying valuable trees upon the land" could warrant the court's equitable intervention "to prevent irreparable mischief and maintain the status quo during the pendency of [the] litigation" over title. *Id.* at 986–87. And modern cases have adhered to this view, too. *See Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 204–05 (D.D.C. 2015) (collecting cases).

The district court here found that the balance of the equities was "neutral." *EOG*, 2024 WL 1193824, at *12. It wasn't. Granting the preliminary injunction permitted EOG—the plaintiff—to cause an irreparable injury; it didn't prevent one. Had the court not granted it, EOG would've simply had to wait things out while Lucky Land would've avoided the destruction of a portion of its land. Given that set of affairs, preserving the status quo would've been a better holding pattern while the case proceeded to a final decision.

## VI.

*Public Interest*.  Finally, we ask where the public interest lies.  The public interest is served by enforcing contractual agreements and protecting vested rights, *see Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 386 (6th Cir. 2023), but what's disputed here is who has what rights under the relevant documents.  So it's not obvious to us which side the public interest favors, at least not without turning back to the merits.

## VII.

For these reasons, we reverse.